IN THE COURT OF APPEALS OF TENNESSEE
AT MEMPHIS
Assigned on Briefs January 2, 2020

**IN RE JEREMIAH S.**

**Appeal from the Juvenile Court for Shelby County
No. DD4645      Dan H. Michael, Judge**

_____

**No. W2019-00610-COA-R3-PT  - Filed April 23, 2020**

_____

A mother appeals the termination of her parental rights to her two children. Following a bench trial, the trial court found that clear and convincing evidence existed to support the statutory grounds of: (1) severe child abuse, Tenn. Code Ann. § 36-1-113(g)(4); (2) abandonment by willful failure to support, Tenn. Code Ann. § 36-1-113(g)(14); (3) abandonment by wanton disregard, Tenn. Code Ann. § 36-1-102(1)(A)(iv); and (4) persistence of conditions, Tenn. Code Ann. § 36-1-113(g)(3)(A). The court also found that termination was in the best interest of the children. We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which JOHN W. MCCLARTY and ARNOLD B. GOLDIN, JJ., joined.

James Shae Atkinson, Memphis, Tennessee, for the appellant, Angela S.[1]

Herbert H. Slatery, Attorney General and Reporter; Matthew D. Cloutier, Assistant Attorney General; Andree K. Blumstein, Solicitor General; and Jessica E. Lott, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

Angela S. ("Mother") and Joseph S. ("Father") are the parents of Jeremiah S., born in April of 2015, and Joseph S. Jr., born in February of 2017, (collectively, "the children"). The children were 22 months old and 28 days old, respectively, when the Department of Children's Services ("DCS") received a referral based on allegations of physical abuse from medical personnel at LeBonheur Children's Hospital in Memphis on March 21, 2017.

---

[1] This court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

The most relevant facts leading up to the referral are as follows. On the morning of March 21, 2017, Father called for emergency assistance because Joseph, who was 28 days old, was non-responsive. When the emergency services arrived, Joseph was in critical condition, suffering from respiratory distress and swelling to his head; thus, he was immediately transported to Baptist Hospital in Memphis. Upon his arrival, Baptist personnel conducted a CT scan that revealed severe skull fractures, one on each side of his head; two broken ribs; two broken femurs; elevated liver enzymes, which is indicative of abdominal trauma; and a severe brain injury—there was hemorrhaging and swelling of the brain tissue. The swelling to his brain was so severe that it was pushing down on the brain stem. As a secondary injury to his brain damage, Joseph suffered from seizures. Joseph was not expected to survive.

Because of the severity of his condition, Joseph was transferred to Lebonheur Children's Hospital for a higher level of care. Carla Frisbie, a child protective services worker with DCS, met with the family at LeBonheur. CT scans performed at LeBonheur revealed a severe brain injury and multiple skull fractures on the parietal bones on both sides of his head. On the right side, he had a severe V-shaped fracture. On the left, he had a fracture very high up. The CT scan also revealed areas of bleeding, which showed the right side of the brain had more significant bleeding including hemorrhage to and swelling of the brain tissue. Because his brain was so swollen, it was pushing down on his brain stem. An x-ray of his entire body revealed rib fractures on the left 7th and 8th ribs and areas of corner fractures at the bottom of his femurs. The corner fractures are also called metaphyseal fractures and result from either twisting or shaking. Joseph also had elevated liver enzymes, which is indicative of abdominal trauma. Dr. Karen Lakin, a pediatrician with a subspecialty in child abuse, was called to consult on the case. Dr. Lakin determined that the brain injury, fractures, and elevated liver enzymes all indicated child abuse.

At the request of DCS and over the protests of Mother, Jeremiah, who was 22 months old at the time, was examined at LeBonheur.[2] The examination of Jeremiah revealed that he had delayed speech, an abrasion to his knee, and bruising to his face, left medial thigh, and back. The medical personnel were unable to get a history from Mother, aside from her stating that Jeremiah was almost three years old and mentioning that the bruising on Jeremiah's forehead was from him hitting his head because of his Attention Deficit Hyperactivity Disorder ("ADHD"). However, the bruising along Jeremiah's forehead was concerning to the medical professionals because it was consistent with subgaleal hemorrhages from hair pulling.[3]

---

[2] Mother protested any evaluation of Jeremiah, saying there was nothing wrong with him.

[3] A subgaleal hemorrhage, also known as a subgaleal hematoma, is a serious neonatal bleeding complication that occurs when blood accumulates outside of the baby's skull (extracranially).

Mother and Father were arrested on March 22, 2017, for aggravated child abuse, and DCS placed both Jeremiah and Joseph in foster homes where they have remained ever since.

On July 25, 2018, DCS filed a petition to terminate Mother's and Father's parental rights in the Juvenile Court for Shelby County.[4] DCS alleged five grounds for termination—severe child abuse pursuant to Tenn. Code Ann. §§ 36-1-113(g)(4) and 37-1-102(b)(27), failure to manifest an ability and willingness to assume custody or financial responsibility pursuant to Tenn. Code Ann. § 36-1-113(g)(14), abandonment pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A), substantial non-compliance with permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2), and persistence of conditions which prevent the children's return pursuant to § 36-1-113(g)(3).

The case was tried on February 14, 2019. At trial, Mother, Dr. Lakin, DCS Case Worker Carla Frisbie, DCS Case Worker Demaris McGuire, Jeremiah's foster mother, and Joseph's foster mother all testified. As to Mother, the court determined that DCS proved by clear and convincing evidence the grounds of severe child abuse, failure to manifest an ability and willingness to assume custody or financial responsibility, abandonment by wanton disregard, and persistence of conditions. The court also determined that termination was in the children's best interests. Accordingly, the court entered judgment terminating Mother's parental rights to both children.

Mother appealed.

### STANDARD OF REVIEW

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). According to the statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, that party must prove the existence of at least one of the statutory grounds for termination set forth in Tenn. Code Ann. § 36-1-113(g). *Id.* Second, the petitioner must prove that termination of parental rights is in the best interest of the child, considering the best interest factors listed in Tenn. Code Ann. § 36-1-113(i). *Id.*

Because of the constitutional dimension of the parent's rights at stake, the party seeking termination must prove both of the required elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *see* Tenn. Code Ann. § 36-1-113(c). To be clear and convincing, the evidence must enable the finder of fact "to form a firm belief or conviction regarding the truth of the facts" sought to be established

---

[4] Following the trial, Father's parental rights were terminated; Father does not appeal that decision.

and eliminate "any serious or substantial doubt about the correctness" of the findings. *In re Bernard T.*, 319 S.W.3d at 596.

Due to this heightened burden of proof applicable in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). Appellate courts review the trial court's factual findings de novo in accordance with Tennessee Rule of Appellate Procedure 13(d), presuming each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016). Then, we make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## ANALYSIS

Mother challenges the trial court's determination that grounds existed for the termination of her parental rights and that termination was in the children's best interests. We will first examine the grounds for termination.

### I.  GROUNDS FOR TERMINATION

#### A.  SEVERE ABUSE

Mother contends the evidence was insufficient to show that she abused Jeremiah or Joseph or that she knew either child was being abused. Mother maintains that there is no evidence that she knowingly caused the children's injuries or that she witnessed the specific incident or incidents that caused them. Mother claims there was no evidence that she failed to protect the children from conduct likely to cause serious bodily injury or death.

Pursuant to Tenn. Code Ann. § 36-1-113(g)(4), a court has grounds for terminating parental rights when the parent has committed severe child abuse, which is defined as "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death." Tenn. Code Ann. § 37-1-102(b)(27). Serious bodily injury includes, *inter alia*, a bone fracture, subdural bleeding, and "injuries to the skin that involve severe bruising." Tenn. Code Ann. § 39-15-402(c).

Regarding the severe child abuse ground for termination, this court explained:

- 4 -

Under the clear and convincing standard, it is important to "distinguish between the specific facts found by the trial court and the combined weight of those facts." Each specific underlying fact need only be established by a preponderance of the evidence. Such specific underlying facts include whether a particular injury suffered by the child was the result of nonaccidental trauma, and whether the caregiver's conduct with respect to the injury was "knowing." Once these specific underlying facts are established by a preponderance of the evidence, the court must step back to look at the combined weight of all of those facts, to see if they clearly and convincingly show severe child abuse.

It is also important to understand the threshold for finding that a parent or caregiver's conduct was "knowing." In child abuse cases, the parent or caregiver may deny that the injury was purposefully inflicted, and where the injuries are inflicted on preverbal infants and children, there is often no witness to the injury other than the parent or caregiver. The "knowing" element can and often must be gleaned from circumstantial evidence, including but not limited to, medical expert testimony on the likelihood that the injury occurred in the manner described by the parent or caregiver.

*In re S.J.*, 387 S.W.3d 576, 591–92 (Tenn. Ct. App. 2012) (citations omitted).

This court further explained that "knowing" conduct was not necessarily intentional conduct. *Id*. at 592. "Knowing" conduct occurs when a person "has actual knowledge of the relevant facts and circumstances or when he or she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to him or her." *Id*. (quoting *In re Caleb J.B.W.*, No. E2009-01996-COA-R3-PT, 2010 WL 2787848, at *5 (Tenn. Ct. App. July 14, 2010)). Thus, "[a] parent's failure to protect a child will also be considered 'knowing' if the parent had been presented with sufficient facts from which he or she could have and should have recognized that severe child abuse had occurred or that it was highly probable that severe child abuse would occur." *In re Caleb J.B.W.*, 2010 WL 2787848, at *5.

Based on the testimony and evidence at the trial, the court ruled that Mother committed severe child abuse against the children as defined by Tenn. Code Ann. § 37-1-102(b)(27)(A)(i), and Joseph suffered serious bodily injury in accordance with Tenn. Code Ann. § 39-15-402(c). Specifically, the trial court found:

…[D]uring a time when [Mother] and her husband were the caregivers for the children, twenty-eight-day old Joseph sustained multiple fractures and abusive head trauma that almost resulted in his death. [Mother] initially denied there being any incident which caused these injuries and instead told DCS that the child was fine and drinking a bottle, and then suddenly began

vomiting and became non-responsive. Later, after she had been arrested on child abuse charges and her husband's charges had been dismissed, she told the Department that her husband harmed the child. When asked at trial whether she hurt Joseph or saw her husband hurt Joseph, [Mother] invoked her right to remain silent pursuant to the 5th amendment. She also invoked her right to remain silent when asked if she delayed in getting Joseph medical attention, whether she and [Father] had a history of domestic violence altercations, and to how Jeremiah sustained injuries to his face, thigh, and back. The Court drew negative inferences from [Mother's] refusal to testify in that it inferred [Mother] or her husband caused the injuries to both children. Whether [Mother] injured the child herself or watched her husband injure Joseph and then she lied for him, her behavior prior to incarceration amounts to wanton disregard for the safety and welfare of her children.

Examining the testimony and other evidence admitted at the trial, we have determined that the evidence preponderates in favor of the trial court's factual findings. Joseph was brought to Baptist for respiratory distress. He stayed at Baptist for a few hours and was diagnosed with multiple skull fractures. Once he was stabilized, Baptist sent him to LeBonheur for a higher level of care. At LeBonheur, Dr. Lakin was asked to consult on the case. According to Dr. Lakin's testimony, she spoke with Mother, who told her that Joseph had suddenly stopped breathing after being fed, which prompted them to call emergency services. Dr. Lakin reviewed the results of the CT scan performed at LeBonheur and testified that she believed within a reasonable degree of medical certainty that Mother's version of events was not consistent with the injuries the children sustained. The CT scan revealed that Joseph suffered from a severe brain injury, multiple skull fractures on both sides of his head on the parietal bones, areas of bleeding on the right side of the brain, a hemorrhage in his brain tissue, and edema. Because Joseph's brain was so swollen that it was actually pushing his skull outward, they did a skeletal survey of his entire body and noticed rib fractures on the left 7th and 8th ribs and corner fractures on the bottom of his femurs. Joseph also had elevated liver enzymes, which is indicative of abdominal trauma. As a result of his injuries, Joseph needed a machine to breathe for him. Joseph began having seizures secondary to the brain injury. So, they treated him for seizures. They had to insert a G-tube because he could not eat. His injuries were extremely serious, and Joseph was not expected to survive.

Further, Dr. Lakin testified with a reasonable degree of medical certainty that a force had to be exerted on the child to cause these injuries and that Joseph's 22-month-old sibling could not exert enough force to cause these injuries. For the "knowing" element of the ground, Dr. Lakin testified that the force necessary to cause the injuries Joseph sustained were such that the person exerting the force should have known that it would cause serious harm. *See* Tenn. Code Ann. 37-1-102(b)(27) (defining "severe child abuse" as the "knowing use of force on a child that is likely to cause serious bodily injury or death"). It was her testimony that Joseph's injuries could not have been sustained accidentally short

of a "massive car accident" or from "being dropped from the top of a building." Due to the severity of the injuries, Dr. Lakin opined that the injuries could not have gone unnoticed. She testified that a child suffering from those injuries would not be acting normally. She also opined that the injuries had to have occurred close to the time Joseph was presented to the hospital for treatment because his injuries were so severe he would not have survived without prompt medical intervention. She opined that if he ate at 3:00 a.m. in the morning and was fine, something had to happen between 3:00 a.m. and when he presented to the hospital later that morning. Dr. Lakin also opined that while she could not say what long-term injuries Joseph would suffer, they would be significant due to his brain trauma.

Jeremiah was also examined at LeBonheur. He had delayed speech, an abrasion to his knee, and bruising to his face, left medial thigh, and back. Aside from stating that Jeremiah was almost three years old (he was 22 months old) and explaining that the bruising to his forehead was from him hitting his head against a wall because of his ADHD, Mother refused to cooperate with or provide information to medical personnel. Dr. Lakin testified that the bruising along Jeremiah's forehead was concerning as subgaleal bruising, which is often caused from hair pulling. Further, in contrast to Mother's statement, children of his age are not diagnosed with ADHD.

As to Jeremiah, Dr. Lakin testified that Jeremiah would not have received a diagnosis of ADHD at his age. Because the bruising along his forehead was along his hairline, it was consistent with subgaleal hemorrhages from hair pulling. Further, Dr. Lakin stated that the bruises on the inner thigh and back were particularly concerning because they were in atypical places for children to get bruised from normal activity or play. Mother was unable to give any explanation for those bruises.

The foregoing evidence clearly and convincingly established, at the very least, that Mother should have recognized that it was highly probable that severe child abuse had already occurred and would occur in the future. *See In re Caleb J.B.W.*, 2010 WL 2787848, at *5. Therefore, DCS proved through clear and convincing evidence that Mother knowingly failed to protect Jeremiah from severe abuse.

DCS caseworker, Carla Frisbie, was called to testify. She said that she spoke with Mother while Joseph was in the hospital and Mother stated that she did not do it. Mother stated that Father was awkward at holding babies and caused the injuries to Joseph. Ms. Frisbie testified that Mother's four other children had been removed from Mother and Father's custody.

At trial, when Mother was asked about the children's injuries, she invoked her Fifth Amendment right against self-incrimination, and the court drew a negative inference from Mother's response. This was proper because, in parental termination cases, the court is permitted to draw a negative inference from a witness's invocation of his or her Fifth Amendment right. *In re Nickolas E.*, No. M2009-01888-COA-R3-PT, 2010 WL 454809,

at *6 (Tenn. Ct. App. Feb. 9, 2010). The relevant portion of Mother's testimony is as follows:

> Q. Did you hurt Joseph on March 21, 2017?
> A. I plead the Fifth Amendment.
> Q. Did you see someone hurt Joseph on that day?
> A. I plead the Fifth Amendment.
> Q. Did you delay in getting medical attention for Joseph?
> A. I plead the Fifth Amendment.
> Q. How did Jeremiah get the bruises that were on his face, thigh and back at the time of the children's removal?
> A. I plead the Fifth Amendment.
> Q. Are you currently incarcerated on charges of Aggravated Child Abuse?
> A. I plead the Fifth Amendment.
> Q. Have you been incarcerated since March 22, 2017?
> A. I plead the Fifth Amendment.
> Q. Did you and [Father] ever have any physical domestic violence altercations?
> A. I plead the Fifth Amendment.

Considering the foregoing, not only have we have determined that each of the court's factual findings is supported by a preponderance of the evidence, we have also determined that, taken together, the facts amount to clear and convincing evidence of the elements necessary to prove the ground of severe child abuse for both children. *See In re Carrington H.*, 483 S.W.3d at 524; *see* Tenn. Code Ann. § 37-1-102(b)(27) (defining "severe child abuse" as "the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death"). "A parent's failure to protect a child will also be considered 'knowing' if the parent had been presented with sufficient facts from which he or she could have and should have recognized that severe child abuse had occurred or that it was highly probable that severe child abuse would occur." *In re Caleb J.B.W.*, 2010 WL 2787848, at *5. Accordingly, we affirm the determination of the trial court that DCS proved the ground of severe child abuse as to both children by clear and convincing evidence.

## B. FAILURE TO MANIFEST ABILITY AND WILLINGNESS TO ASSUME CUSTODY

The trial court found that Mother "failed to manifest an ability and willingness . . . to personally assume legal and physical custody or financial responsibility of the child" pursuant to Tenn. Code Ann. § 36-1-113(g)(14).

Under this ground, a parent's rights may be terminated if he or she

[1] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and [2] placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). Under this ground for termination, the petitioner must prove each element by clear and convincing evidence. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018). This ground was added to the statute effective July 1, 2016, and because of its recent enactment, relatively few cases have considered this particular ground for termination. *In re Colton B.*, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at *9 (Tenn. Ct. App. Oct. 29, 2018) *perm. app. denied* (Tenn. Jan. 22, 2019).

As such, our analysis begins with whether DCS met its burden to prove the first element of this ground for termination. As an initial matter, we note that there has been some disagreement in this Court as to the proof required of this ground. *Compare In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018) (holding that the petitioner must prove both an inability and unwillingness to assume custody or financial responsibility of a child), with *In re Amynn K.*, No. 2017-01866-COA-R3-PT, 2018 WL 3058280, at *12 (Tenn. Ct. App. June 20, 2018) (holding that the petitioner need only prove that "a parent has failed to meet the requirement of manifesting both a willingness and an ability to assume legal and physical custody of the child or has failed to meet the requirement of manifesting both a willingness and an ability to assume financial responsibility of the child."). Courts have avoided this dispute by noting that the evidence was clear and convincing under even the more stringent standard. *See, e.g.*, *In re J'Khari F.*, No. M2018-00708-COA-R3-PT, 2019 WL 411538, at *15 (Tenn. Ct. App. Jan. 31, 2019) (noting both *In re Ayden S.* and *In re Amynn K.* but ultimately concluding that DCS presented sufficient evidence that "Mother was not able or willing to assume physical or legal custody of or financial responsibility for the Child"); *In re Colton B.*, 2018 WL 5415921, at *9-10 (noting the split in authority but holding that it was unnecessary to choose one approach where the parent had manifested neither an ability nor a willingness to parent the child).

Recently, this Court has endorsed the latter approach adopted in *In re Amynn K. See, e.g.*, *In re H.S.*, No. M2019-00808-COA-R3-PT, 2020 WL 1428777, at *10 (Tenn. Ct. App. Mar. 20, 2020) ("After careful consideration of the conflicting authorities, we accept DCS's invitation to follow the holding of *In re Amynn K.*"); *In re Jayda H.*, No. E2019-00855-COA-R3-PT, 2019 WL 6320503, at *9 (Tenn. Ct. App. Nov. 25, 2019) ("[C]onsistent with the discussion in the *In re Amynn K.* decision, we do not view a parent's demonstration of 'willingness' as fatal to this ground when accompanied by a failure to manifest the requisite 'ability.'"); *see also In re Bentley Q.*, No. E2019-00957-COA-R3-PT, 2020 WL 1181804, at *10 (Tenn. Ct. App. Mar. 11, 2020); *In re Serenity S.*, No.

E2019-00277-COA-R3-PT, 2020 WL 522439, at *16 (Tenn. Ct. App. Jan. 31, 2020); *but see In re Neveah M.*, No. M2019-00313-COA-R3-PT, 2020 WL 1042502, at *16 (Tenn. Ct. App. Mar. 4, 2020) (following *In re Ayden S.* with one judge concurring in results only).

This court recently examined this ground for termination in *In re Nevaeh B.*, No. E2019-01539-COA-R3-PT, 2020 WL 1527001, at *7 (Tenn. Ct. App. Mar. 31, 2020) and explained:

> We also find guidance in our supreme court's decision in *In re Bernard T.*, 319 S.W.3d 586, 604 (Tenn. 2010), wherein the Court considered a similar ground for termination, applicable to putative fathers, which applies when "[t]he person has failed to manifest an ability and willingness to assume legal and physical custody of the child[.]" Tenn. Code Ann. § 36-1-113(g)(9)(A)(iv). The Court affirmed termination under this ground where the father had "manifested a commendable willingness to assume legal custody of all the children" but "conceded that he was unable to support the children financially and that he could not provide them with a stable residence." *Id.* According to the Court, "This testimony alone provide[d] clear and convincing evidence that [the father] [did] not presently have the ability to assume legal and physical custody of any of the children." *Id.* at 604-05.

We find the foregoing instructive. Applying the interpretation in *In re Amynn K.*, DCS was required to prove that Mother "failed to meet the requirement of manifesting both a willingness and an ability to assume legal and physical custody of the child or has failed to meet the requirement of manifesting both a willingness and an ability to assume financial responsibility of the child." 2018 WL 3058280, at *14.

We note that the critical time period for this ground is the time preceding the filing of the petition to terminate parental rights, *see In re M.E.N.J.*, No. E2017-01074-COA-R3-PT, 2017 WL 6603658, at *6 (Tenn. Ct. App. Dec. 27, 2017), though this court will also consider the parent's actions following the filing of the petition and up to the time of trial, *see In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. April 4, 2018). Mother had been incarcerated for approximately sixteen months when the petition was filed on July 25, 2018, and was still incarcerated at the time of trial and offered no indication that she would be released soon.

On appeal, Mother argues that the trial court erred in finding that DCS proved this ground by clear and convincing evidence because throughout her incarceration, Mother completed several classes that were available to her, maintained contact with DCS, and expressed a desire to regain custody of her children.

At the trial, Ms. McGuire testified that DCS created a permanency plan for Jeremiah and Joseph on April 12, 2017, and the plan was ratified by the court in July 2017. The plan states that Mother is to, *inter alia*, complete a mental health assessment, complete a parenting assessment, participate in a domestic violence class, complete A & D treatment, have proof of stable housing or income, and visit. The trial court found that Mother failed to comply with the permanency plan. She had not taken classes that addressed any of the core reasons that the children were removed from her care, did not have a significant bond with her children, and was unable to provide the extensive care necessary for Joseph to survive. Accordingly, the trial court determined that this ground had been proven as to both children, finding in pertinent part:

> Pursuant to Tennessee Code Annotated § 36-1-113(i)(1), [Mother] has not made an adjustment of circumstance, conduct, or conditions as to make it safe and in the children's best interest to be in her home. [Mother] continues to be in an environment that is not suitable for her children in that she has been incarcerated for almost two years and has no end date for her incarceration. Also, [Mother] has not complied with the tasks on the permanency plan or indicated how she will keep her children safe in the future.

> .   .   .

> [Mother] [has] failed to manifest, by act or omission, an ability or willingness to personally assume legal and physical custody or financial responsibility of the children, and placing the children in [her] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the children. Therefore [her] parental rights should be terminated pursuant to Tennessee Code Annotated section 36-1-113(g)(14). As more fully stated above, [Mother] severely abused Joseph, Jr., when he was only 28 days old, resulting in lifelong severe injuries to the child. No steps have been taken by the [Mother] to assess what mental, psychological, or other form of impairment would cause them to severely abuse an infant, and therefore no corrective measures have been taken to resolve such an impairment. Therefore, the children would be at risk of the same abuse if they were returned to the care of the [Mother].

As to the second element, the trial court found that placing the children in Mother's custody would pose a risk of substantial harm to their physical or psychological welfare. This Court has explained that substantial harm "connotes a real hazard or danger that is not minor, trivial, or insignificant," and "it indicates that the harm must be more than a theoretical possibility." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001). In other

- 11 -

words, while the harm need not be inevitable, it must be "sufficiently probable to prompt a reasonable person" to believe that the harm is more likely than not to occur. *Id.*

Considering the foregoing, the evidence is more than sufficient to prove the first ground of failure to manifest a willingness and ability to assume custody or financial responsibility. *See In re Carrington H.*, 483 S.W.3d at 524. Unlike *In re Colton B.,* this is a case where a parent manifested a willingness to assume custody and financial responsibility but was unable to do so. Mother has been incarcerated since March 22, 2017 – about half of Jeremiah's life and nearly all of Joseph's, evidencing a clear inability to assume custody and financial responsibility, despite any amount of willingness. As such, we conclude that DCS presented sufficient evidence to establish that Mother was not able and willing to assume physical or legal custody of the children.

## C. ABANDONMENT BY WANTON DISREGARD

Abandonment by conduct exhibiting wanton disregard is designated as a ground for terminating parental rights and is defined as follows:

> (iv) A parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, or a parent or guardian has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and has. . . . engaged in conduct prior to incarceration that exhibits wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(iv).

This court has stated that Tenn. Code Ann. § 36-1-102(1)(A)(iv) "reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 866. "A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." *Id.* (citing James G. Dwyer, *A Taxonomy of Children's Existing Rights in State Decision Making About Their Relationship*, 11 Wm. & Mary Bill Rts. J. 845, 958 (2003)). However, incarceration alone does not satisfy the test for abandonment under § 36-1-102(1)(A)(iv). *Id.* To sustain the ground, the court must find "by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child." *Id.* Accordingly, a parent's incarceration is "a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.*

Unlike the relevant period for abandonment for failure to visit and failure to support, the relevant pre-incarceration period for conduct exhibiting disregard referred to in Tenn. Code Ann. § 36-1-102(1)(A)(iv) "is not limited to acts during the four-month period immediately preceding the incarceration." *In re Jeremiah T.*, No. E2008-02099-COA-R3-PT, 2009 WL 1162860, at *8 (Tenn. Ct. App. Apr. 30, 2009) (citing *In re Audrey S.*, 182 S.W.3d at 871). To the contrary, "the court may consider a parent's behavior prior to the four months immediately preceding incarceration in finding behavior that exhibited wanton disregard for the child." *In re Michael O.*, No. W2017-01412-COA-R3-PT, 2018 WL 576777, at *5 (Tenn. Ct. App. Jan. 26, 2018) (citing *In re Audrey S.*, 182 S.W.3d at 871).

As such, the issue is whether Mother's conduct prior to incarceration exhibited a wanton disregard for the welfare of the child. *See id.* Pursuant to Tenn. Code Ann. § 36-1-113(k), trial courts terminating parental rights are required to "'enter an order which makes specific findings of fact and conclusions of law' whether they have been requested to do so or not." *In re Audrey S.*, 182 S.W.3d at 861.

Here, the trial court found that Mother engaged in conduct prior to incarceration that exhibited a wanton disregard for the welfare of the children. Specifically, the court found that during the time when Mother and Father were the caregivers for the children, 28-day-old Joseph sustained multiple fractures and abusive head trauma that almost resulted in his death. Mother initially denied there being any incident which caused these injuries and instead told DCS that the child was fine and drinking a bottle and then suddenly began vomiting and became non-responsive. Later, after she was arrested on child abuse charges and her husband's charges were dismissed, she told the Department that her husband harmed the child. When asked at trial whether she hurt Joseph or saw her husband hurt Joseph, Mother invoked her right to remain silent pursuant to the Fifth Amendment. She also invoked her right to remain silent when asked if she delayed in getting Joseph medical attention, if she and Father had a history of domestic violence, and how Jeremiah sustained injuries to his face, thigh, and back. The court drew negative inferences from Mother's refusal to testify in that it inferred Mother or Father caused the injuries to both children. Whether Mother injured the child herself or watched her husband injure Joseph and then lied for him, the court found that her behavior prior to incarceration amounted to wanton disregard for the safety and welfare of her children.

As we consider whether the foregoing sufficiently complies with the mandate in Tenn. Code Ann. § 36-1-113(k) and whether the facts in the record clearly and convincingly establish the ground of abandonment by exhibiting conduct of wanton disregard for the child, we find it appropriate to consider other cases in which we affirmed the trial court's finding of wanton disregard. *See In re Kierra B.*, No. E2012-02539-COA-R3-PT, 2014 WL 118504, at *8 (Tenn. Ct. App. Jan. 14, 2014) (Father showed a wanton disregard for child by engaging in "criminal behavior [that] was serious and detrimental to his child's welfare" and which resulted in him being "absent from [child's]

life for most of her childhood"); *In re K.F.R.T.*, 493 S.W.3d 55, 61 (Tenn. Ct. App. 2016) (finding that father's behavior was part of a broader pattern of conduct that rendered him unfit because he "was arrested for theft, multiple D.U.I. offenses, repeated traffic offenses, domestic violence against the biological mother of the children central to this appeal, multiple illegal border crossings, and even extortion"); *In re Donte N.*, E2013-01617-COA-R3-PT, 2014 WL 201612, at *8 (Tenn. Ct. App. Jan. 17, 2014) (finding that father exhibited a wanton disregard for his children after he failed to comply with the permanency plan and moved out of state, where he was then convicted of several offenses and received two one-year sentences for charges involving minors); *In re C.L.D.*, No. M2008-02805-COAR3-PT, 2009 WL 1684667, at *7 (Tenn. Ct. App. June 15, 2009) (concluding that mother exhibited a wanton disregard for the children by, among other things, "being arrested approximately forty-seven times"; leaving two of the children "with her grandmother who, admittedly, was unable to care for them"; and leaving the youngest child "in the care of complete strangers"); *In re Selena L.*, No. E2015-02059-COA-R3-PT, 2016 WL 4056185, at *12 (Tenn. Ct. App. July 27, 2016) (finding that "Mother's conduct prior to her incarceration, including both her criminal activity and her illegal drug use, clearly and convincingly constituted a wanton disregard for the welfare of the Children"); *In re Charles K. Jr.*, No. M2015-00714-COA-R3-PT, 2016 WL 3036049, at *10 (Tenn. Ct. App. May 19, 2016) (finding clear and convincing evidence that father showed wanton disregard for the children where father "exhibited a substantial amount of criminal behavior, . . . engaged in domestic violence toward Mother while in the presence of the Children, and . . . failed to address his mental health and substance abuse issues").

Mother claims that there was insufficient evidence to support a finding of wanton disregard because there was "no proof introduced into the record of repeated incarceration, substance abuse, or various criminal violations." However, this sort of proof is not required. While conduct like repeated incarceration, substance abuse, and various criminal violations are sufficient to show wanton disregard, they do not represent an exhaustive list of the conduct that might suffice. The scope of what can constitute wanton disregard is quite broad. *See In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App., filed June 9, 2015) (observing that "[t]he actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child"); *see also In re William B.*, No. M2014-01762-COA-R3-PT, 2015 WL 3647928, at *3 (Tenn. Ct. App., filed June 11, 2015) (explaining that "a parent's poor judgment and bad acts that affect the children constitute a wanton disregard for the welfare of the children" (citation omitted)).

Comparing Mother's conduct during the relevant period with the conduct in the above cases, we affirm the trial court's conclusion that the ground of wanton disregard was proven by clear and convincing evidence.

D. PERSISTENCE OF CONDITIONS

The last ground for termination found by the trial court is commonly referred to as persistence of conditions or persistent conditions. The ground of persistent conditions is defined as follows:

> A. The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or the conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
>> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
>> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
> B. The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard; . . . .

Tenn. Code Ann. § 36-1-113(g)(3). In this case, the children were removed from Mother's custody by court order in the juvenile court dependency and neglect proceeding more than six months prior to the termination hearing. As such, this ground is applicable.

The purpose of this ground for termination is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Jamazin H.M.*, No. W2013-01986-COA-R3-PT, 2014 WL 2442548, at *6 (Tenn. Ct. App. May 28, 2014) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3 2008)). The relevant question is whether the child can be safely returned to the custody of the parent. *Id.* "A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.,* No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (citing *In re T.S. & M.S.*, No M1999-

01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000)). The failure to remedy the conditions which led to the removal need not be willful. *In re T.S. & M.S.*, 2000 WL 964775, at *6 (citing *State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990)). "Where . . . efforts to provide help to improve the parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id*. at *7.

We cannot conclude that the trial court erred in finding sufficient evidence to support this ground for termination. Here, the children were removed from Mother's custody in March of 2017 by order of the juvenile court due to allegations of severe abuse. The juvenile court found the children were victims of severe abuse and, as a result, found them to be dependent and neglected. Several months later, DCS filed a petition to terminate Mother's parental rights. Since the children were removed, Mother has failed to demonstrate that she has remedied – or will likely be able to remedy – the conditions that led to the children's removal.

Mother was incarcerated at the time of the children's removal over two years ago. At the time of trial, she was still incarcerated on charges of aggravated child abuse. There is no indication – or allegation – that she will be released in the near future. Even if she were to be released soon, Mother has provided no reason to believe the children can be safely returned to her custody. *See In re Jamazin H.M.*, 2014 WL 2442548, at *6. Just before Mother was incarcerated, she and Father were living with the children in a motel. Because of her incarceration, Mother has not shown any proof of income or housing. The DCS Family Services Worker testified that Mother is not in a position to regain custody and that Mother does not understand the full extent of Joseph's injuries or have the ability to care for him. Mother has not received training in how to accommodate Joseph's special needs, like feeding him through his G-tube or giving him his medication.

As such, the trial court found the continuation of Mother's relationship with the children greatly diminishes their chances of early integration into safe, stable, and permanent homes. *See* Tenn. Code Ann. § 36-1-113(g)(3)(C). The court held that Mother had not made such a lasting adjustment as to enable the children to be returned to her safely. Specifically, the Court held that Mother had no specific release date from jail, was still awaiting trial on aggravated abuse charges, had not taken her mental health assessment, and had not completed any domestic violence classes. Meanwhile, both children have been placed in pre-adoptive foster homes. At the time of trial, Jeremiah had been living in his foster home for nearly a year and Joseph had been living in his for nearly two years. The testimony at trial was that Jeremiah is "thriving" in his foster home. When he arrived, Jeremiah had a speech delay and would only say a few words. Now, Jeremiah receives speech therapy, talks regularly, and has been using full sentences and more complex words. As for Joseph, he receives all of the special care he needs. Between his foster mother and several nurses, he has 24/7 care. In addition to this care, he receives physical and

occupational therapy. His foster mother testified she is willing and able to care for his special needs for the rest of his life.

Taking all of the above into consideration, we find that the continuation of the legal parent and child relationship greatly diminishes the children's chances of early integration into a safe, stable, and permanent home. Therefore, we affirm the trial court's decision to terminate Mother's parental rights under this ground.

## II.    BEST INTERESTS

Mother contends that the applicable best interest factors found in Tenn. Code Ann. § 36-1-113(i) weigh against the termination of her parental rights. She argues that she has begun taking the necessary steps to provide a safe home for her children.

"In addition to presenting clear and convincing evidence establishing at least one statutory ground warranting the termination of a biological parent's parental rights," a petitioner must "present clear and convincing evidence that terminating the parent's rights is in the best interests of the affected child." *In re Bernard T.*, 319 S.W.3d 586, 606 (Tenn. 2010); Tenn. Code Ann. § 36-1-113(c). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010). Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence," and "[i]t produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citations omitted).

While the combined weight of the evidence must meet the clear and convincing standard, facts considered in the best-interests analysis need be proven only "by a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015)). The best-interests analysis "is guided by a consideration of the factors listed in Tenn. Code Ann. § 36-1-113(i)." *In re Bernard T.*, 319 S.W.3d at 606.

When considering the statutory factors, "[t]he child's best interests must be viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. "A focus on the perspective of the child is the common theme running through the list of mandatory factors specified in Tenn. Code Ann. § 36-1-113(i)." *In re Audrey S.*, 182 S.W.3d at 878. "When the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d).

Tennessee Code Annotated § 36-1-113(i) provides a list of nine non-exclusive factors for courts to consider when making the best interests determination. The analysis is not a rote examination of each factor followed by "a determination of whether the sum of the factors tips in favor of or against the parent." *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). Instead, "[t]he relevancy and weight to be given each factor depends on the unique facts of each case." *Id.* "Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.*

The most significant factor for the trial court in this case, and for this court, is factor six—"[w]hether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household[.]" Tenn. Code Ann. § 36-1-113(i)(6). The evidence clearly and convincingly established that while in the sole care of his parents, Joseph was abused to the point of sustaining multiple severe skull fractures, hemorrhaging and swelling of his brain tissue, fractured ribs, and fractures to his femurs. And according to Dr. Lakin's testimony, the injuries Joseph sustained are so severe that they will have long-term effects on Joseph's overall health and development. All the while, the evidence is clear and convincing that Mother knew the children were being abused and failed to protect them.

Thus, the evidence also shows that Mother is incapable of providing a safe environment for the children. *Id*. § 113(1) ("Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian[.]"); *id*. § 113(8) ("Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child[.]"). Mother denies she or Father ever abused the child, despite hearing Dr. Lakin's compelling and uncontroverted testimony. Mother is not mentally prepared to provide a safe home for the children.

We also find that a change in caretakers would have a negative effect on the children's emotional, psychological and medical condition. *See id*. § 113(i)(5) ("The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition").

Jeremiah's foster mother testified:

> He's in a really good place. He's come a long way. He's a happy little boy. He's healthy. He's friendly. He has a great time at school. He goes to preschool at the school where I teach, and he's very smart. He loves to read. He's in a very good situation. I teach in the junior high. He's in our early

childhood center, but he and my students are like best buddies. He has a happy life.

Joseph's foster mother testified:

> With Joseph, Joseph is blind. And he's unable to sit up or stand up, and the only thing he can do is kind of raise his arms a little bit and kick a little bit, and we have to do all his total care. And he takes feeding, you know g-tube feeding, liquid feeding. He's not able to take – he was on a bottle at one time, but he had started aspirating and we had to take him off that.
>
> .        .        .
>
> Well, you know. Just that he needs a lot of care, and Joseph is, you know, just a special young boy that needs someone that's going to love him and, you know, care for him and make sure that his needs are up front.

DCS caseworker, Ms. McGuire testified:

> Jeremiah has integrated very well into the foster home. He is doing extremely well with the whole family. He's in school right now. He's in Pre-K, and he has no health issues. He does have speech issues, and he's getting speech classes, speech therapy for that. Otherwise, he is progressing just like any normal child.
>
> .        .        .
>
> Joseph's injuries are never going to be any better. He does receive physical therapy, occupational therapy, not speech therapy right now, but those two. He receives therapy. He goes to the doctor numerous times. He sees a neurologist on a regular basis. He has seizures that for now he takes – right now, he takes three different seizure medications. He has a g-tube for feeding. He's not able to have any food by mouth. They once tried to feed him with a bottle, but that didn't work. So, he's exclusively on a g-tube. He has breathing difficulties. He has a CPAP machine at night to make sure he doesn't stop breathing. He's immobile.

Dr. Lakin testified that Joseph will need multiple medical visits to address his issues. A child who requires the level of medical care that Joseph requires will need vigilant and attentive caregivers, and the evidence shows that Mother is not up to the task.

Ms. McGuire and Jeremiah's foster mother testified that Jeremiah has bonded with the foster parents and they want to adopt him. Jeremiah considers his foster mother to be

his mother and he has no meaningful relationship with Mother. *See id.* § 113(i)(4) ("Whether a meaningful relationship has otherwise been established between the parent or guardian and the child[.]"). Similarly, Joseph's foster mother testified that she wants to adopt him. She also testified that Joseph has no meaningful relationship with Mother. *See id.* Granted, the court issued a no contact order against Mother which prevented her from developing a relationship with her children, but Mother necessitated the no contact order by severely abusing the children, and thus, making it unsafe for the children to be in her custody.

Therefore, viewing the circumstances from Jeremiah and Joseph's point of view, we conclude the evidence clearly and convincingly establishes that termination of Mother's rights is in Jeremiah and Joseph's best interests.

## IN CONCLUSION

The judgment of the trial court is affirmed and this matter is remanded with costs of appeal assessed against the appellant, Angela S.

_____
FRANK G. CLEMENT JR., P.J., M.S.